Yes, Sam, first of all, good morning to everybody. I'm Jonathan Capp. I'm the attorney for the appellant, Mr. De Freitas. Sitting with me is Mr. De Freitas' Brazilian lawyer, who's from Sao Paulo, Brazil, Alvaro Goubert. I guess, may it please the court, I guess what I think I will do, first of all, I'd like to say I'd like to reserve five minutes for any rebuttal. I might want to make, but I've read the briefs again. I read them all last night, and I'm very satisfied that I've explained our position. So what I would like to do now is I'd like to make a couple of additional comments and focus in on a couple of points, which I believe will persuade you that we should get a retrial, a second trial in this matter. First of all, let me explain how the case progressed. Essentially, there was this horrific accident in Las Vegas, Nevada. As a result of this, the spouse of Mr. De Freitas died three or four years after the accident. We filed a complaint in district court alleging negligence against the driver of the car, Mr. Stevens, and the Hertz Corporation. Obviously, the negligence against Mr. Stevens was that he suffered from pedal confusion, and he was one of the causes of the accident. The claim against Hertz was that they failed to properly manage and operate the return area, and part of that was the fact that they had unusually wide lanes. As discovery progressed, we then added the cause of action for negligent entrustment on the basis of the call made by Mrs. Stevens, which, of course, I've mentioned in the briefs. Subsequent to that, we then added an allegation for punitive damages, and I'll talk about that in a moment. But at no time did we ever allege that the car was in any way defective. We always alleged that Hertz didn't properly manage the return area, and my point on that is it appears that this case was tried with those facts not being known to the court throughout the trial. If Your Honours look at the trial order, I set that out very clearly. This was a trial order that was signed by the judge where I set out what we're alleging, there's a failure of traffic management. I set that out. At no time ever did we allege that the car was defective. Obviously, the first thing we did was check that. We hired an engineer to check the car. And so it's perplexing in the extreme that on the day, or rather on the eve of closing argument, the judge, prior to striking the claim, she actually said, she used words to the effect that initially we had alleged that the car was defective, and that argument hasn't been properly distilled to this point. So it appears that for whatever reason, the court believed we had alleged that the car was defective. Secondly... How does that relate to anything before us now? Well... It sounds like you're generically saying the district judge didn't understand the case. But that's not a challenge on appeal. You've given us specific arguments on appeal, and I'm not sure how any of this that you're describing to us supports the arguments you've made to us in our briefs. Well, the reason I say that is because our position is that a trial has to be conducted in accordance with the trial order. In this case, that didn't happen. You're speaking on a very abstract level. What exactly was wrong with the trial because of the purported misunderstanding of the district court? Well, I was going to go on to say, if I can just... Well, you're five minutes into it, so I'm hoping you're going to get to it at some point. Right. Well, I'll get to it now. Another point the court made was that they believed in their final order on the misconduct part of this, that the trial was just about lane width. In fact, the court said that precisely. They said we went to trial just on the basis of the lane width, so that wasn't the case. We intended to go to trial on the basis of the traffic management. The problems were the fact that the return area wasn't properly managed. And that caused enormous problems. And to answer your question, Your Honor, let me explain why that was an enormous problem. Because of that, the court incorrectly struck our experts. The court didn't properly understand what they were testifying to, what they wanted to testify to. They wanted to testify to the failure of traffic management, all three of them. And the court said, well, I'll give you the example of, a specific example of Dr. Presswood. When the court struck Dr. Presswood as an expert, and this is a very experienced traffic engineer. He was the former city engineer for the city of Las Vegas. I've mentioned this all in my brief, how experienced he was. The court basically struck him on the basis that the court wrongly believed that he didn't do enough research into the question, a question which purely related to lane widths. The court didn't credit him with the data he looked at. Even worse than that, the court said the opinions he was giving were not expert opinions. One of the opinions he wanted to give was that he'd read the plans at the time when they changed the lanes from 10 feet to 15 feet. He read the plans and he said, well, because they described 15 feet lanes as an alternative width, that means that that deviates, the use of that by an engineer of the word alternative deviates from the industry standard of 10 feet. And because of that, she struck his entire testimony. She struck the testimony that he wanted to give us to the traffic management part of it with all the diagrams. So the fact that she believed that this case was just about lane widths is absolutely crucial because that fundamental mistake on her part, her narrow view of the case. So counsel, I think I'm as confused as Judge Clifton. Everything you keep telling me keeps relating to lane width, but you seem to think there's a different claim about traffic management. Does that have to do with the way personnel were waving cars in? I don't understand what the difference is between the lane width argument and your argument that this was about traffic management. Well, it was a huge difference. Okay. Well, tell me what the traffic management problem was. Does that relate to lane width or is it something different? Something different. Okay. What is it? Well, what it is is that irrespective of the widths of the lanes, the cars, when they're entering the area, should have been directed away from people who are unloading their cars. So let's say, for example, you have four adjacent lanes, lane 1, 2, 3, and 4. What they did, they used two adjacent lanes. They used lanes 2 and 3. And what that meant was instead of using, say, lane 1 and 4, where there would have been more space, instead of directing cars away from people who are unloading another vehicle, they didn't do that. They had no— And more space is a good thing? Absolutely. And doesn't that cut against your argument about the lane width? Not exactly, no. Because the argument about the lane width was that the fact that the lanes were 15 feet as opposed to 10, it created a uniquely dangerous gap, which of about seven or eight feet, where you had no chance to take any kind of evasive action. It's a totally different—it's way beyond lane widths. And that's what our experts— Well, sort of like you're asking for a 20-foot lane width so you can have alternating lanes. I've got to tell you, I've returned hundreds of rental cars. I don't think I've ever had a situation where entire lanes are skipped. Sure, I can understand you get the cars further apart, but that's just not how it's done. It would take twice as much space if you only used every other lane. Is that your case, that they were required by standards to use every other lane? And that's a standard I have never seen actually implemented in all the times I've returned a rental car? And I doubt that I'm going to see it when I return a rental car here in Phoenix. So is that your case? Is that what you're complaining about? Well, part of the case is that because they had a 60-foot bay, because they had plenty of space, they absolutely should have had a system whereby they didn't— they had a system where they prevented returning cars being close to people, say, unloading another car. That's what we're saying. Whatever they did, whether they were 10-foot lanes, 15-foot lanes, or 20-foot lanes, the key point is that they should not have allowed— Does that mean that they can't use all the lanes that they've allocated? No. No, not at all, because they could alternate. Let's say, for example, it was a particularly busy day, and they had four lanes, or they had six lanes, because they did have six lanes, then if somebody's unloading the trunk from one car, they could divert people to another lane where people aren't— they could alternate how the cars return. And that's exactly what our experts wanted to testify to, and they weren't permitted to because the judge didn't understand or didn't focus in or discounted that there was a traffic management issue. It's distinct from lanes. Wasn't the judges ruling that the experts' opinions were not based on a reasonable and reliable methodology, or that it wasn't within their knowledge and experience? Well, no. No, it wasn't. As far as Dr. Presswood was concerned, what she said was, as I just described, she said, he doesn't know about the industry standards for lane widths. What the opinion he's giving is not expert opinion, which I submit it manifestly was, and then she just excluded him. It was almost a non sequitur. She didn't really give a reason for why she excluded him. As far as Mr. Brannon was concerned, we had— I grant the motion as to Presswood. Known to this Court as primarily a slip-and-fall guy, Presswood, the accident expert, has not been shown by the plaintiff to be, quote, in rental car return facility design, quote, by knowledge, skill, experience, training, or education, close quote, as Rule 702 requires, and he goes on. I think a reason was given. What's wrong with the reason? Well, but the reason was faulty, because what she said was, she goes on, and she said, and she went on to say, the reason she said his opinion was based on, I think, just reviewing a prior plan, just reviewing the deposition transcript, and that's about it. But it was a lot more than that. So what expertise did he bring to the table? If his testimony is based on a reviewing what other witnesses said, what does he bring into the table? What's his expertise that qualifies under Rule 702? Well, I go on to say, the judge was wrong in saying that. I go on to explain in the brief how that wasn't what he was just relying on. What happened was, she misread the deposition transcript that Hertz had provided. He had a wealth of knowledge, a wealth of expertise. He examined the plans, as I said, with the expression alternating lane. He explained what that meant. Did his expertise, is it drawn from reviewing the materials in this case? Did he bring something? Did he have any experience with rental car lanes or any kind of return lane? Or is he simply looking at what was said by others in this case and offering a different view? If it's the latter, it's not so clear to me that he qualifies under 702. Well, he was the former city engineer for the city of Las Vegas. I think he's designed over 1,000 parking lots. He's designed, from memory, from what I put, he's designed multiple. He's never designed a Conrack. He's never designed a rental car Conrack. That's for sure. But as Hertz admits, it's very hard to find someone who's an expert in a Conrack. I mean, this is, I mean, as a plaintiff. I'm looking at your brief where you're talking about this, and I don't see any of the discussion that demonstrates that he has expertise. Where should I be looking? Well, I believe, well, I think I've made all my arguments in my brief. But I think he's, if somebody's the former city engineer for the city of Las Vegas, I believe that qualifies him. So, counsel, I heard you say just a minute ago that Presswood was going to read the plans to change the width of the lanes and saw the word alternative from the 10-foot to the 15-foot and that he was going to testify that this was a deviation from the standard. Then I heard you say that Presswood was going to talk about alternating lanes. Alternating, directing people into alternate lanes is very different from designing an alternative. You've used alternative in two different ways, and I don't get, I don't understand the argument, because it feels like you just keep shifting ground as to what Presswood was going to testify to. Was he going to testify that they shouldn't have had 15-foot lanes because that was an alternative to 10-foot lanes, or was he going to testify that Hertz employees should have directed returning drivers to alternative lanes, to alternating lanes? Yes, he was going to testify to the latter. Yes, he was going to say. And not to the former? Well, I believe he was going to testify to both. He was going to testify that he was going to. And is it industry standard to have employees directing returning patrons to alternating lanes? Well, there is no industry standard. Even Hertz admitted that. There's no industry standard as to any of the traffic management issues here. It's a reasonable standard. But that was one of the other problems with the case, that even Hertz admitted there was no industry standard as to how traffic's managed in return lanes. And neither of our experts could find an industry standard. The only industry standard they could find was one for 10 feet for the lanes. And that wasn't specified by any certifying body or anything other than the fact that that's how it's usually done? Correct. Yes, more or less. And did anybody ever suggest that the reason it was only 10 feet was because anything broader would be, it certainly would be more expensive in very tight places? Did anybody testify that it was unsafe to have anything wider than 10 feet? Yes, they did. Our experts did. Yes. But not for the reason behind the industry standard? Well, yes, the reason behind the industry standard is that it's a safety standard. Correct. Yes. And who was going to testify as to that? Both of our experts. But none of them had ever designed one of these things before. How could they testify that the industry standard was 10 feet and that it was 10 feet because anything wider than that would be a safety issue as opposed to an economic issue? Because it would require companies to have broader areas in confined spaces in order to have auto returns. Well, because as Mr. Brannan is a very experienced, he's a professor at Cal State University in traffic management. He's a very senior, or he was at the time, he was a very senior manager for Caltrans. He said that there's nothing unique, there's nothing at all unique about a return area. It's general principles that apply. That's what he said. Did you wish to reserve some time for rebuttal? Yes, I did. I think I was going to reserve five minutes. Well, you have two minutes now. Oh, I better reserve. I better be quiet then. Thank you, Your Honor. Good morning, Your Honors, and may it please the Court. I'm Linda Coberly for the Hertz Corporation, and I hope I can simplify this for the Court in the next few minutes. There are two appeals here. The first one is directly from the judgment. The second is from the denial of a Rule 60B motion. As for the first appeal, no Rule 59 motion was filed in this case. That means that for most of the issues in the first appeal, there's actually nothing for this Court to review. The plaintiff did not ask the district court to decide whether there should be a new trial based on things like the jury instructions or the Daubert-related issues that we were just discussing or the scope of cross-examination or alleged misconduct or the district court's misinterpretation of what the claims were. So there's really nothing for this court to review. The only issue in the first appeal that's really properly before this court is the district court's grant of a Rule 50 motion on the claim for negligent entrustment, which counsel referred to right before deliberations, and I'm happy to address that. There's an issue. Let me ask you for a second. You just made an argument that most of the issues aren't before us because there was no Rule 59 motion. Is that ever mentioned in the answering brief? Your Honor, the – We've commented to your colleague that we're starting with the brief. That's what the case has presented to us. Yes. I don't recall seeing anything about that in the brief. You are correct, Your Honor. Okay. Well, maybe we should get to the issues that are raised. We could, except that if I may, Your Honor, the absent – you're right, and I apologize for that on behalf of my client. I appeared after that brief was filed in the case. But we don't – there aren't do-overs. I understand. The case has been argued to us. We're approaching the case that way. We prepared that way. And you're trying to throw in an argument. We don't let arguments come up for the first time in reply briefs. We don't let arguments come up for the first time at oral argument. My point, Your Honor, is this is actually a kind of argument that the Court can't ignore. And the reason – Let us surprise you sometimes.  Okay. Very good. Very good. And the reason I say that is that the absence – you're absolutely correct that although the answering brief that was filed in the first appeal does not make the argument that no Rule 59 motion was filed and therefore none of this is properly before the Court, it does cite several times that no Rule 59 motion was filed. And more importantly, the absence of a more robust argument on that point doesn't solve the basic problem, which is that there is – on the issue of whether a new trial should be granted, there is no exercise of discretion in the district court for this court to review. And that's my point simply. As to the second appeal, I need to acknowledge a jurisdictional issue, but I would also like to propose a solution to it. The Rule 60 motion was filed after the notice of appeal had been filed in the case that led to the first appeal. So the district court lacked jurisdiction to resolve the Rule 60B motion. That, too, you will not see in the answering briefs, Your Honor. However, obviously, it's a jurisdictional issue. When I was in practice, I sometimes took over cases after they've been briefed. So I understand the situation you're facing. But I've got to say, the more you talk about issues that haven't been presented to us, the more it begins to suggest that you're not prepared to deal with the issues that have been presented to us. I don't think that's the message you want to convey. It is certainly not the message I intend to convey, Your Honor. But I did want to – So now we're four minutes into your time. You've identified these things. But maybe someday I hope you're going to get around to the issues that actually were argued to us in the briefs and that we're prepared to deal with. I am, sir. But if I may, let me just try to solve the jurisdictional problem that I just highlighted for the Court, which is that in the interest of judicial economy, we would urge the Court to treat the second appeal as a motion for remand based on an indicative ruling and proceed to reject the arguments on their merits. And now, Your Honor, I will turn to the merits of the issues. On the negligent entrustment claim, which we think is properly before the Court in the first appeal, the plaintiff had no evidence that Hurt actually knew at any point that the driver was incompetent. And that was the basis for the Court's ruling. Nevada law requires for a negligent entrustment claim that a defendant entrusted the car to someone it knew to be experienced or incompetent. The only proof, the only proof that was ever offered on that point was the testimony of the driver's wife, who said that she called Hurts to complain about the car to say that it wasn't performing as they wanted and they wanted a different one. As a matter of law, that doesn't show knowledge by Hurts that the driver was incompetent. That was how the Court framed its ruling. And if you — in fact, even the plaintiff himself in his briefs doesn't say that the call itself, which, again, is the only evidence supporting the negligent entrustment claim, even the plaintiff doesn't say that the call itself put Hurts on notice of driver incompetence. What they say instead is if Hurts had reacted differently to the car, to the call, then it might have learned facts that might have alerted it to driver incompetence. The best example of this is in the reply brief in the first appeal at page 5. In fact, had Hurts retrieved and inspected the car, Hurts would have realized that the driver could not safely operate the car. That's a different theory. That is not negligent entrustment. That's a claim that there was negligence in failing to retrieve the car. And the District Court was correct to conclude that the evidence that had been offered did not show knowledge by Hurts of any incompetence by the driver. That's all the Court needs to affirm the decision on that issue. I'd like to turn to the expert fee issue that lays at the — it's mentioned in the first appeal. It also lays at the core of the second appeal. And this is with respect to the Rule 60B motion. The standard of review here is high. It requires a clear showing of an abuse of discretion in indicating that relief under Rule 60B would be denied. The plaintiff moved here under Rule 60B-3, so the plaintiff had the burden to show clear and convincing evidence that the verdict was obtained through fraud, misrepresentation, or other misconduct, and that he couldn't fairly and fully present the claims. The District Court gave three thoughtful, clear, thorough reasons why that request for relief would be denied. And there is no basis on this record to conclude that all three of those were an abuse of discretion. The first reason, of course, is that the Court found no clear and convincing evidence of fraud in the first place. Mr. Jarvis, who I think it's fair to say misstated on the record the amount of his compensation, his testimony was full of hedging. That was how the District Court read it, having observed it at the time and read it on the papers. He used words like, I'm guessing, something like, maybe. And then he gave a number that was obviously wrong, which was $2,000. Counsel, he had sent a bill over to the counsel who was at the table, not the counsel who was conducting the examination, and nothing was ever corrected. He did not. So, first of all, he did not send the bill. His employer sent the bill. Sure. And that was part of the problem. Yeah, although he later sent a bill. He later sent a bill under his own name. When he no longer worked for that employer.  So at the time of his testimony, this whole issue of expert compensation had not been explored in discovery. So counsel on cross-examination asked him for the first time, how much were you paid? And he said, I'm guessing, I don't know, maybe, different. I'm not sure he used the words, I don't know. But he said a bunch of things. Even District Court thought his number was utterly implausible. Yes. And the plaintiff's counsel did not pursue it. Yeah. I've got a couple of questions here. One is, if it's implausible to the District Court, why isn't it implausible to Hertz's counsel? And suggest that there's, that they ought to be careful in using it in closing. And a second question is, under Rule 26, weren't you obligated to disclose all of this in advance in discovery? Without, without plaintiff's counsel asking for it? That's an excellent question. Neither side, as far as I know, disclosed that kind of information in discovery. So yes, perhaps. I couldn't find any reference to Rule 26 in the District Court's orders or in any of the briefings. So nobody's complained about it. But do you know whether it was provided? I don't believe so, Your Honor. I don't believe it was provided. But you would have been obligated to provide it and to update it under Rule 26. I believe that would be correct. That hasn't been part of the briefing, but I believe that would be correct. But, and you're quite right that, and the District Court acknowledged this, that Hertz's counsel should have been prepared with the real information, should have been prepared to correct it. And I think it's fair to say that the Court is suggesting that $2,000 was such a low number and so implausible that everybody, the Court, the lawyers, both sides, should have realized that it was a mistake. And I will accept that premise because it seemed very low to me as well. But here's the issue. We're before the Court on an appeal from a Rule 60B motion. And the plaintiff was required to come forward with evidence that it was more than just a mistake, failure to prepare adequately, failure to comply with a discovery obligation. The plaintiff was required to come forward with clear and convincing evidence of fraud. And they didn't do it. The District Court looked at declarations, looked at the record that had been provided, criticized Hertz's counsel for not being sufficiently prepared to correct this problem. And nonetheless, looking at the whole record, concluded that there was no basis for Rule 60B relief, both because the Court found there's no evidence of intentional fraud, as the rule would require. Secondly, that plaintiff himself was also unnoticed and reflected in his questioning that he didn't believe the 2,000 either. The plaintiff had every opportunity at that point to issue a trial subpoena, ask for the records, ask to clarify it, ask another question. And he simply moved on instead. And the diligence requirement that this Court imposes on Rule 60B motions required him to do more. He bears the burden, because he is the movant seeking this extraordinary relief, he bears the burden of showing that he couldn't have figured this out earlier. That's a high bar. I understand that's a high bar. And it is — that is independent of whether Hertz's counsel had an obligation to correct the record. In order to get the extraordinary relief he's asking for, he would have had to show the District Court that he could not have figured it out during the trial, even during the trial he could have issued subpoenas and whatever, and he didn't do it. And that was one — why — the second reason why the District Court denied relief. And, of course, the third reason was that the District Court looked at the record as a whole and concluded that the plaintiff was able to fully and fairly present his case. He — the District Court, she looked at the trial record, including the closing argument, and including the references to the $2,000 in Hertz's closing argument, and concluded that the gist of what Hertz was pointing out in closing argument was that the plaintiff's experts did not have the right expertise. They did not have expertise in designing car rental lanes. They did not have experience in the industry. That was the gist. That was the import of the closing argument. And given the lack of evidence and how the District Court viewed the record as a whole, the District Court concluded that the plaintiff did have an opportunity to fully and fairly present his case. Is it your position that the lack of diligence alone is enough to support the District Judge's decision denying the Rule 60 motion? So the District Court also said this was a battle of the experts, and I think plaintiffs have made a pretty compelling argument that this deprived them of information to cross-examine and impeach the credibility of the defense experts to make the sort of usual suggestion that they're hired guns and they're making a lot of money for coming in to say these things to you, and, you know, you should believe our experts rather than theirs. So it could be viewed as a fairly serious problem at the trial. But I don't think the record shows that they made any meet and confer and asked for supplementation of disclosures, subpoenaed billing records, issued any other sorts of discovery to obtain the billing records. So the District Court's conclusion that they were not diligent seems well-placed. Is that enough? Yes, I think that is enough, Your Honor, under this Court's cases. There is a requirement in this Court, and we've cited authority for the proposition, that diligence is required, and the Casey v. Albertson decision, for example, specifically states that 60b-3 requires that the fraud not be discoverable by due diligence before or during the proceedings. So even during the proceedings, counsel, I think, if we all agree that 2000 was implausibly low, counsel had an opportunity to ask for the records and so on. So I would say that is enough by itself to sustain the verdict. We think any of these grounds are sufficient for this Court to affirm the denial of 60b-3 relief, any of the three grounds, no fraud, no showing of due diligence that it wasn't discoverable, and that it didn't ultimately affect the verdict. And on that point, I do want to emphasize that Mr. Jarvis is the one who we're talking about here. Mr. Jarvis was a me-too expert. Both parties agree in their briefs that Mr. Jarvis repeated and affirmed the opinion that Mr. Markits had already given. So there were really two different experts who were saying the same thing, and this issue about the 2000 affects Mr. Jarvis. It doesn't affect Mr. Markits. As for Mr. Markits himself, there's a dispute about his testimony. In fact, he was asked how much he was paid. He gave a number that was actually a teensy bit more than he had actually been paid at that point. And the district court looked at all of that in context, looked at the words of what he said and concluded that that wasn't an inaccuracy at all in context. So that's another reason. Because Jarvis was really echoing what another expert had said, I think that too helps to support the conclusion that none of this substantially affected the verdict. Can you circle back to Plaintiff's argument that the district judge misunderstood their theory of the case and that their experts were qualified to and were prepared to offer opinions about traffic flow management in the rental car return area? I didn't read that in the briefing. I didn't understand that to be an argument before today. But nonetheless, was it in their expert reports? Was it something that the district judge should have noted and addressed? Your Honor, I don't think so. That is, as the court notes, not an issue that was part of the briefing, other than I think counsel offered it to suggest that there was something wrong with how the judge ruled on the negligent entrustment theory. I think that's the only instance in which I read the briefs by plaintiff to address this issue of confusion. I do think, as the court pointed out earlier this morning, these experts that plaintiff had offered were new to the industry. They had no prior experience. And the judge was certainly within her discretion to conclude that they should not be allowed to testify about standards for designing or, frankly, handling rental car return. I mean, they were not experts in that field. That was the basis for her ruling. So whether the specific thing they intended to testify about, I don't know how clear this was in their reports, I'll be honest with you, but whether what they were going to testify was about the width of the lanes or whether they were going to be testifying that an employee should have been standing there directing traffic, they still didn't have any expertise to offer on rental car return locations. And that is why the district court struck or limited their testimony. And that was not an abuse of discretion. So I think this whole issue, though, just highlights why all of these issues are things that we entrust to the district court's discretion. Because the district court is in the best position to try to figure out what the claims are and how they're being argued. The district court is in the best position to evaluate the qualifications of an expert. The district court is in the best position to determine whether there was an inappropriate limit on cross-examination or whether something that was said in closing argument was prejudicial. And here the district court actually cured and issued curative instructions following many of Mr. Capp's objections during the closing argument. So there's simply no basis here to find an abuse of discretion in any sense, either in denying Rule 60B relief, in the rulings themselves, and certainly not in denying a new trial which the district court was not given an opportunity to weigh in on. Thank you. Thank you. Just very briefly, as far as the traffic management issue, that was thoroughly briefed, thoroughly briefed in the appeal. I attached the reports. I attached diagrams reflecting that. So that's all I can say about that. Also, I also explained Mr. Brennan was excluded because the Dalbert hearing was unfairly conducted, and I asked Your Honours to re-read what I put about the traffic management. As far as the misconduct is concerned, there is no requirement for due diligence for misconduct or misrepresentation. In the Ninth Circuit, and I believe in the Ninth Circuit alone, there is a requirement for fraud. And if Your Honours read Casey, what Casey said was they referred to a previous case. I think it was a Pacific Railroad case where the Ninth Circuit had looked at the word fraud. They'd analyzed what fraud was, and they determined there was a due diligence requirement. And that was in a discovery case, nothing to do with this case. The gravamen of what happened here was the rank misconduct on closing. That was on closing where their lawyer said three times, untruthfully, that their expert had only been paid $2,000. That violates the canons of ethics. That violates the code of conduct. If you end up in State Bar Court, you don't get to argue due diligence. If an attorney commits misconduct, it's no defense whatsoever that there was no due diligence. Also, if Your Honours look at the State Bar Court, I mean, there may be an ethical objection raised, but we're here trying to adjudicate the appeal as to whether the district court's judgment should be set aside. That's not the same as State Bar Court. So you're trying to tell me that due diligence doesn't matter, but our case law says that it does. But it doesn't. It only says it matters for fraud. Congress says it doesn't matter. If Your Honour reads the rule, and I wrote this in my brief, if it's undiscovered evidence, Congress, the legislature, put the words due diligence or cannot reasonably be discovered. The next sentence, they don't put those words. And I think we're entitled to assume that the legislature, if there was a due diligence requirement, they would have put that in. Now, the Ninth Circuit, I believe, read due diligence from the word fraud. And they went back to the prior case where the Ninth Circuit, in the arbitration case, I think it's the case that Casey references, they said, I assume what the Ninth Circuit thought was because the word fraud appears, we'll apply due diligence. But this is not just fraud. This is misconduct and misrepresentation. Congress said fraud, misrepresentation, misconduct. Congress did that for a reason. They used the word misconduct for a reason. And they did not put the word could not have been reasonably discovered in that subsection. That's subsection, I believe, three. Whereas they did in the preceding subsection. I believe congressional intent is quite clear. I mean, I can see why the Ninth Circuit read a due diligence requirement into the word fraud. But, I mean, I can see why they did that. I can't argue with the Ninth Circuit, but misconduct. That's what we're bound to follow. We're bound by the precedent of the Ninth Circuit. But the Ninth Circuit don't mention misconduct. They don't mention misconduct. So are you conceding what we all have drawn from the record, that if there was a failing in the Rule 26 disclosures, plaintiffs did not raise that during discovery. They didn't seek supplementation. They didn't issue subpoenas for the expert's files or billing. They didn't send out a discovery request. None of that happened before this trial. Well, it would have been impossible to have done so after closing arguments. It was not impossible to do so during discovery. That was my question.  Yes, we didn't. And actually, nor did anybody in this case. And you could have followed up your questions to the experts at some time. I don't know if the $2,000 struck you as implausible. I'm not an experienced trial lawyer. I had other experience. But the $2,000 struck me as implausible. If it struck you as implausible, why didn't you follow it up with questions at the time? Because why dig the hole deeper? The hole was the hole of the other side's expert. Why not dig that hole deeper? No, because how did I know he wasn't doing it as a favor to Hertz? How do I know he's in the industry? He may have been involved in building the — he may have been involved in constructing this contract. These guys are all in the industry. I don't know what relationship he has. He may have — he's an architect. This guy works for the industry. For all I know, they're giving him a bulk of business for other things. I mean, I don't believe it's right that I should be blamed when they've clearly, clearly committed perjury. Their attorney, they had to have known about this to — they had to have known this was wrong. He issued those bills. Was there any disclosure by either side, but by Hertz in particular, as to the hourly rates that the experts were charging? Of course. Of course. It goes without saying. I mean, I should have put that in my brief, but it goes without saying. They have to disclose that. Did they? My question is, did they? Was there a disclosure of rates but not the bills? Was there anything disclosed about the experts? Well, of course there was, Your Honor. Of course there was. I mean, I should have stated that obvious fact. Of course it was disclosed. It's disclosed under the rules. They disclosed that amount, and he issued the bills. No, you're talking about in their request — I believe you're talking about their request for attorney's fees, that they disclosed all this information and said this is what we paid, or their request for cost after the trial. But during discovery, before the trial, did either side disclose the hourly rates that the experts were being paid? Well, of course they did. They were required to do that under the rules. When they designate the expert, they designate his — And you're saying that Hertz did comply with the rule? Yes. Okay. So you knew the rate before trial? Yes. Okay. Did you know how many — about how many hours they were going to be working on this, or what the total — approximately the total value of their services would be? What I asked him when he told me — Not what you asked him. What was disclosed under Rule 26? Yes, but I didn't know whether or not he was doing it as some kind of — he's an industry guy. He works for the industry. For all I know, he's got a bulk of other — it's like an attorney. Did you ask him and the experts any of these questions in deposition? No. Okay. So you violated the cardinal rule of asking on cross-examination a question that you did not know the answer to. I'm not saying rule is in the sense of the rules of civil procedure, but you decided to pursue this line of questioning in the middle of the trial, and you had not done any of the discovery in advance. And then you say, well, once he gave an implausible answer, I didn't want to dig the hole deeper. You'd already opened that door and started digging the hole. Well, as did every lawyer in this case. Nobody subpoenaed any documents. I mean, it's — there's time constraints on how many hours you have to try these cases. I'm not in a position where I can start making a trial and a trial and spending hours going through the billings for all the experts. But my point is that matters nothing. That matters nothing. Because there's misconduct. There was misconduct. The gravamen of this is the misconduct on closing. How on earth could I have done anything about that? I can't interrupt a closing argument. I can't issue subpoenas and that kind of thing. The gravamen is the misconduct. As I've said, Congress has said it's fraud, misrepresentation, or misconduct. That's what Congress has said. Well, when you keep referring to Congress, what are you referring to? Is that the rule, Rule 63? That's the rule. Well, yeah, but Congress doesn't write the rule. So I was confused by your references to Congress. You're talking about a criminal fraud statute or what? Apparently it's Rule 60 you're referring to. Is that right? Correct. Well, my understanding is it's enacted by Congress. I hope they read these things. Maybe they don't. I don't know. So you've gone pretty significantly over time. Sorry. Unless my colleagues have any additional questions. All right. Thank you both for your arguments this morning. Thank you. Thank you.
judges: CLIFTON, BYBEE, BADE